NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DAVID ANTONIO,<br><br>                    Petitioner,<br><br>           v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | Civil Action No. 21-17659 (GC)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court on the counseled amended motion to vacate, correct, or set aside Petitioner David Antonio's sentence under 28 U.S.C. § 2255 (§ 2255) (Amended Motion to Vacate).  (ECF No. 3.)  Respondent United States of America answered the motion (ECF No. 9), and Petitioner filed a reply (ECF No. 11).  The Court conducted an evidentiary hearing on November 22, 2025.  (ECF No. 24; ECF No. 26.)  The Court has carefully considered the parties' submissions and the testimony and arguments presented at the evidentiary hearing.  For the reasons set forth below, and other good cause shown, the Amended Motion to Vacate is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Underlying Criminal Proceeding

The underlying criminal case (Crim. No. 19-134-3) arose out of an extensive investigation by federal and local authorities into drug trafficking, firearms, and violent crime in and around Trenton, New Jersey.  In a May 13, 2019 letter to the Honorable Freda L. Wolfson, U.S.C.D.J.,

Petitioner requested dismissal of his currently assigned counsel, and the assignment of new counsel, on the grounds that, while he had met with the attorney "several times and he has provided me with some discovery," this discovery did not concern him, and the counsel failed to explain to him the nature of the proceedings and provide him with any material information regarding the case. (ECF No. 3-5 at 1-2 ("May 13, 2019 Letter").) According to Petitioner, counsel was not acting in Petitioner's best interests and advocating for his cause. (*Id.*) Petitioner also was not "comfortable" with counsel's attitude or demeanor, finding the attorney "arrogant in his presentation; when we meet, I feel as if he does not deem me to be a person and/or a someone." (ECF No. 3-5 at 2.)

At the evidentiary hearing, Petitioner testified that he asked for his counsel to be relieved because he was not being given the "right discovery" and because of "the misconduct of the police officer." (ECF No. 26 at 5:1-24.) Petitioner characterized his level of confidence in counsel's representation as "very low." (*Id.* at 5:25-6:3.) But Petitioner acknowledged that counsel came and visited him "many times." (*Id.* at 10:8-12.) Counsel testified that Chief Judge Wolfson assured Petitioner of his attorney's competence and asked Petitioner to "sit down with [counsel and the Assistant United States Attorney] and talk about this and see if [Petitioner] really want[s] another attorney." (*Id.* at 31:12-19.) They did, and Petitioner agreed to "stick with" his current counsel. (*Id.*) Judge Wolfson denied his letter request for new counsel. (Crim. No. 19-134-3, ECF No. 321.)

On or about February 27, 2020, a Third Superseding Indictment was filed, charging Petitioner and several other Defendants[1] with one count of conspiracy to distribute and possess

---

[1]    Six other Defendants were charged in Count One: Jerome Roberts, Timothy Wimbush, Taquan Wiliams, Jubri West, Dennis Cheston, Jr., and Wayne Bush. (ECF No. 3-2 at 2.) The Third Superseding Indictment included additional charges against these other Defendants. (*See*

with intent to distribute one kilogram or more of heroin, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), in violation of 21 U.S.C. § 846 ("Count One").  (ECF No. 3-2 at 2-10 ("Third Superseding Indictment").)  Petitioner was also charged with one count of possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) ("Count Two").  (ECF No. 3-2 at 11.)  The Third Superseding Indictment alleged that Petitioner had a prior conviction subjecting him to an enhanced penalty under 21 U.S.C. § 841(b)(1)(A). (ECF No. 3-2 at 24-25.)

On March 2, 2020, Petitioner entered a Plea Agreement with the Government in which he agreed to plead guilty to Count One.  (*See* ECF No. 3-3 ("Plea Agreement") at 1-2.)  Under the terms of the Plea Agreement, the Government agreed to withdraw Count Two.  (*Id.*)  The Plea Agreement stated that Count One carries a statutory mandatory minimum prison sentence of ten years; however, if it were determined that the enhanced penalty pursuant to §§ 841(b)(1)(A) and 851 applies, the applicable mandatory minimum sentence would be fifteen years.  (ECF No. 3-3 at 2.)  Petitioner stipulated to the fact that the quantity of heroin involved in the conspiracy charged in the Third Superseding Indictment was at least one kilogram; on December 1, 2011, he pled guilty in the United States Court for the District of New Jersey to conspiracy with intent to distribute 100 grams or more of a mixture or quantity containing a detectable amount of heroin, contrary to §§ 841(a)(1) and (b)(1)(B), and in violation of § 846; he was sentenced on April 19, 2012 to 46 months' imprisonment on the 2011 conviction; he served more than 12 months' imprisonment in connection with the 2011 conviction and was released from prison on May 23, 2014; and his commission of the offense charged in Count One occurred within fifteen years of his release from prison on the 2011 conviction.  (*Id.* at 7; *see also id.* at 3.)  The Government and

---

Crim. No. 19-134, ECF No. 452.)  In total, twenty-six Defendants were charged with participating in the drug conspiracy.  (ECF No. 9 at 5.)

Petitioner further "waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C § 2255." (ECF No. 3-3 at 4.) Specifically, the parties stipulated that, "[i]f the sentencing court accepts a factual stipulation set forth above, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so." (*Id.* at 7.) "Otherwise, both parties reserve the right to file, oppose, or take any position in any appeal, collateral attack, or proceeding involving post-sentencing motions or writs," and "[n]o provision of this agreement shall preclude [Petitioner] from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion claiming that [Petitioner] received constitutionally ineffective assistance of counsel." (*Id.* at 4, 7.) Petitioner and his plea counsel agreed that they discussed the provisions of the Plea Agreement, Petitioner understood and accepted the terms of the Plea Agreement, and Petitioner wanted to plead guilty pursuant to the Plea Agreement. (*Id.* at 6.)

On March 18, 2020, Petitioner appeared for a change of plea hearing before Chief Judge Wolfson. (Crim. No. 19-134-3, ECF No. 469.) Petitioner entered a guilty plea as to Count One of the Third Superseding Indictment. (*Id.*)

On April 15, 2020, Chief Judge Wolfson denied motions to suppress filed by co-Defendants Wimbush, Williams, and West. *See United States v. Wimbush*, No. 19-134, 2020 WL 1873020, at *1 (D.N.J. Apr. 15, 2020). The three Defendants sought to suppress physical evidence, guns, and drugs seized on September 6, 2018 during pat down and vehicle searches conducted following a traffic stop of a vehicle (a Volkswagen Passat) being driven by Wimbush (with Williams and West as passengers) and in a subsequent vehicle search conducted pursuant to a search warrant for the vehicle. *Id.* at *1-5. Among other things, "Defendants identif[ied] various

4

false and/or misleading statements in the search warrant affidavit drafted by [Detective Sergeant David Ordille, Trenton Police Department], which they assert[ed], render[ed] the search warrant invalid under the framework set forth by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978)." *Wimbush*, 2020 WL 1873020, at *18 (citation omitted). "The Government acknowledge[d] that while 'several of defendants' challenges are overstated . . . a few are well taken,' but contends that, overall, the search warrant affidavit 'does not reflect a conscious or reckless effort to deceive—nor did it have a capacity to deceive—the issuing judge as to probable cause.'" *Id.* (citation omitted).

Chief Judge Wolfson concluded that "the validity of the search warrant [was] immaterial because, pursuant to the automobile exception, law enforcement could search the entirety of the vehicle, without a warrant, regardless of whether they had the opportunity to seek a warrant." *Id.* (citations omitted). Accordingly, because she "need not make a finding regarding the validity of" an unnecessary search warrant, Chief Judge Wolfson did not conduct a *Franks* analysis; however, "based on the multiple serious misstatements in the warrant application," she did address "two specific misstatements identified by Defendants: the statements regarding the confidential informant's tip and the purpose of law enforcement's surveillance efforts on September 6, 2018." *Id.* (footnote omitted). In addition, Chief Judge Wolfson did not recount the other misstatements in the search warrant application because a complete *Franks* analysis was not performed and, "even assuming the *Franks* analysis was applied," the motion to suppress failed under the second prong of *Franks* (that such statements or omissions are material or necessary to the probable cause determination):

> After supplementing the search affidavit with the improperly omitted facts and eliminating the misstatements, as required by the *Franks* framework, I, nonetheless, find that the misstatements and omissions, while significant, were not material or necessary to the

5

> probable cause determination, due to the simple fact that the search warrant affidavit correctly states that the canine officer indicated the presence of drugs in the Volkswagen Passat. That alone would be sufficient for the judge authorizing the warrant to find probable cause. [*United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010)] ("[A] dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant.").

*Id.* *18 n.19.

Regarding the two specific misstatements in the search warrant affidavit, Detective Sergeant Ordille averred that, after conducting the motor vehicle stop on September 4, 2018, he was advised by a confidential informant that the vehicle contained a hidden compartment in the rear passenger seat area that Wimbush used to stash illegal narcotics and firearms. *Id.* at *19. The suppression hearing testimony showed that Detective Sergeant Ordille did not speak to the confidential informant (instead another detective named Cox spoke with the informant and then informed Detective Sergeant Ordille of the trap's location). *Id.* Furthermore, on September 2, 2018 (when the confidential informant provided the information regarding the trap compartment), Detective Cox was aware that, according to a September 1, 2018 report, the informant had engaged in criminal activity and the FBI was going to terminate him as a source (which occurred on September 30, 2018). *Id.* Detective Cox did not relay this information, which would impact the reliability of the source, to Detective Sergeant Ordille, but testified that she characterized the informant as reliable when speaking with Detective Sergeant Ordille. *Id.*

According to Chief Judge Wolfson, neither Detective Sergeant Ordille nor Detective Cox provided an adequate explanation for why the affidavit falsely stated that Detective Sergeant Ordille directly communicated with the informant. *Id.* Detective Sergeant Ordille testified that they were attempting to keep an ongoing wiretap investigation and the identity of the informant confidential, but he also acknowledged that he could have met these objectives by other means

6

(*i.e.*, writing that he was advised by other members of law enforcement instead of "mispresenting the nature of the interaction with the confidential informant"). *Id.* (citation omitted).

Chief Judge Wolfson criticized Detective Sergeant Ordille's (and Detective Cox's) conduct, noting that, although law enforcement are permitted to rely on information provided by another law enforcement officer, "apparently, such disclosures, that the law enforcement affiant is relying on information from other law enforcement officers, are routinely not made on warrant applications submitted by the Trenton police department." *Id.* "Indeed, Detective Cox admitted, '[t]he information that we receive is often just interchangeable and that's how we write it.' This testimony is eye opening and should be remedied." *Id.* (alteration in original) (citations omitted). Chief Judge Wolfson further explained:

> The search warrant affidavit's failure to disclose that the affiant, Detective Sergeant Ordille, did not speak to the confidential informant, and instead was relying upon information from another officer is deceptive and lacks candor to the Court. Law enforcement is already given great latitude in drafting a search warrant affidavit; they are permitted to rely on the collective knowledge of the department, as well as hearsay. Here, however, the affidavit is written in the first person and affirmatively states that Detective Sergeant Ordille spoke to the confidential informant. This misrepresentation is particularly disconcerting in this context, because the Supreme Court has made clear that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'" *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)); *see also United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (explaining that the "Supreme Court uses a flexible standard that assesses the relative value and reliability of an informant's tip in light of the totality of the circumstances"). As the record makes clear, Detective Sergeant Ordille could not have personally attested to any of the circumstances impacting the value or reliability of the confidential informant's tip, since he did not deal with or directly communicate with the informant. Indeed, the actual circumstances under which the tip was obtained indicate that it was hearsay based on hearsay. When pressed on the reliability of the tip, Detective Cox revealed that the confidential informant "just overheard" the information. The affidavit's failure to clearly

7

> identify the true circumstances surrounding the tip prevented the reviewing judging from probing, if he or she found it necessary, the sufficiency and reliability of the tip. These infirmities in the affidavit's assertions are only further compounded by the discovery that the confidential informant had committed criminal activity, and that the FBI had made the determination to terminate him.

*Id.* at \*19 (alterations in original) (citations omitted) (footnote omitted).

The second misstatement in the affidavit involved the reason for law enforcement's surveillance. The search warrant asserted that, on September 6, 2018, members of the Trenton Police Department's Violent Crimes Unit and Detective Alex Maldonado of the Ewing Police Narcotics Unit conducted surveillance in the area of the 800 block of Stuyvesant Avenue due to the recent shootings; however, the suppression hearing testimony unequivocally established that this statement was false because Detective Sergeant Ordille acknowledged that the officers were not surveilling the area due to the recent shootings and were instead acting at the task force's direction to assist the FBI. *Id.* at \*20. Detective Sergeant Ordille testified that he described the purpose of the surveillance to keep the wiretap investigation from being discovered and to protect the integrity of the federal investigation. *Id.* The Government argued that the use of the words "due to the recent shootings" accurately captured the "thrust" of what quickly developed (but not the initial reason for the surveillance) and, in any event, there was no deliberate attempt to deceive. *Id.* According to Chief Judge Wolfson, "[t]his assertion is undercut by Detective Sergeant Ordille's own testimony, which clearly establishes that he deliberately obfuscated the purpose of the surveillance." *Id.* "Even if well-intentioned, Detective Sergeant Ordille deliberately misstated the information in the search warrant affidavit." *Id.*

In the end, Chief Judge Wolfson reached the following conclusion with respect to the misstatements in Detective Sergeant Ordille's search warrant affidavit (and other problems related to the September 6, 2018 motor vehicle stop):

8

Both of the statements regarding the interaction with the confidential informant and the misrepresentation of law enforcement's purpose are affirmative acts of deliberate deception. The failure to apprise a reviewing judge of all the material facts relevant to the law enforcement investigation, particularly in the context of hearsay information obtained from confidential informants, and attesting to the reliability of informants, is unjustifiable. Time constraints and pressures often arise during a criminal investigation, which is why law enforcement is not held to a standard of absolute, exacting accuracy; but, there is no excuse for an officer, swearing on a search warrant affidavit, to not make all reasonable attempts to ensure the accuracy and completeness of the information provided to the reviewing judge. Absent candor and diligence on the part of the affiant, the judge reviewing the warrant application cannot perform his or her role in safeguarding the warrant process. *See Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016) (explaining that "[i]f, however, the officer does not provide the neutral magistrate with an accurate affidavit of probable cause, the protection afforded by the magistrate's review is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are"). Unlike the other misstatements and omissions identified by Defendants, these particular misstatements are reflective of more than mere carelessness or negligence on the part of the drafting officer. They are the product of wholly inappropriate police practices, which are tantamount to lack of candor to the Court.

The above-identified misstatements in the search warrant were not the only errors which occurred during the search and arrest of Defendants. In many respects, law enforcement's investigation was marked by easily avoidable errors and carelessness, which obligated this Court to heavily scrutinize the officers' conduct, and engage in a searching analysis to be assured of its constitutionality. Aspects of the investigation, such as the discrepancy between Laurel Place and Laurel Avenue and Detective Cox's failure to document the September 4, 2018 contact with the confidential informant, are indicative of haphazard recordkeeping and neglect. While these errors were not sufficient to find that Defendants' Fourth Amendment rights were violated, they nonetheless gave the Court pause and reason to question the officers' credibility. Such practices complicate the judiciary's role as the protector of individual liberties and may interfere with the Court's ability to assess the proprietary of law enforcement's conduct. Nonetheless, despite these errors and the significant misstatements in the affidavit, I have found that a search warrant was not required, and an independent basis existed for the search based upon the automobile exception and the positive

> canine sniff alerting to the odor of narcotics. Therefore, the evidence seized in connection with the motor vehicle stop on September 6, 2018, including the drugs seized during the patdown search of West, the items found in the car during the stop, and the items found in the trap compartment of the Volkswagen Passat, are not suppressed.

*Id.*[2]

The United States Probation Office ("Probation Office") prepared a presentence investigation report ("PSR"). According to the PSR, law enforcement intercepted numerous communications between Petitioner and his co-conspirators, including calls where Petitioner agreed to supply Roberts and Jakir Taylor with hundreds of "bricks" (grams) of heroin. (PSR ¶¶ 136-54.) On October 25, 2018, law enforcement arrested Petitioner at 820 Chambers Street, Trenton, New Jersey and conducted a court-ordered search of the premises. (*Id.* ¶ 155.) Law enforcement found, among other things, approximately 800 bricks of heroin, along with a substantial amount of unpackaged heroin (and "laboratory analysis revealed a total net weight of approximately 1.4 kilograms of a substance containing both heroin and fentanyl"). (*Id.*) The Probation Office determined that "1.4 kilograms of fentanyl results in a base offense level of 32,

---

[2] On June 17, 2020, a hearing was conducted on disciplinary charges against Detective Sergeant Ordille based on his purposeful submission of an affidavit with "deliberate untruthful information." (ECF No. 3-6 at 1.) The hearing officer for the City of Trenton found that the city proved its case that the detective deliberately submitted false statements in his sworn affidavit. (*Id.* at 11.) "As a result of his false statements, Ordille cannot currently testify as a witness without independent corroboration. However, the Prosecutor will allow him to testify again after undergoing additional training/retraining." (*Id.*) The hearing officer recommended that Detective Sergeant Ordille be suspended for six months without pay and, as a condition of his return to employment, undergo additional training with respect to such matters as the preparation of search warrant applications. (*Id.*) According to Petitioner, on March 24, 2021, Detective Sergeant Ordille withdrew his final challenge to the findings of the Trenton Police Department. (ECF No. 3-1 at 21.)

Additionally, following a jury trial before Chief Judge Wolfson, Roberts, Wimbush, and Williams were convicted on some counts. *See United States v. Roberts*, No. 19-0134, 2022 WL 92863, at *1 (D.N.J. Jan. 10, 2022). The three Defendants' appeals are currently pending before the Third Circuit. (*See* 3d Cir. Nos. 22-2124, 23-2341, 24-2119).

pursuant to USSG § 2D.1(c)(4) as the offense involved at least 1.2 kilograms but less than 4 kilograms of fentanyl." (*Id.* ¶ 183.)  The Probation Office also applied a two-level enhancement under U.S.S.G. § 2D.1(b)(1) because a machete was found leaning against the wall at the residence and a three-level increase under U.S.S.G. § 3B.1(b) on the grounds that he was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. (*Id.* ¶¶ 188, 191.)  The Probation Office calculated a total offense level of 36 and a criminal history category of III, resulting in an advisory sentencing range of 235 to 293 months' imprisonment. (*Id.* ¶ 243.)

Through his plea counsel, Petitioner objected to the drug amount calculation, the two-level weapon enhancement based on the machete, and the there-level "manager or supervisor" enhancement.  (*See id.* at 51-52.)

On September 16, 2020, a sentencing hearing was conducted, at which Chief Judge Wolfson resolved Petitioner's objections as follows: (1) "So I have determined that I am not going to apply the two-level enhancement . . . based upon the 1.2 kilograms of fentanyl being present" (and accordingly started from an undisputed base offense level of 30 instead of 32) (Crim. No. 19-134-3, ECF No. 725 at 33:17-22); (2) Chief Judge Wolfson applied a two-level enhancement for a dangerous weapon (a machete) (*id.* at 39:2-40:4); and (3) she applied a three-level enhancement on account of Petitioner's role as a manager or supervisor of criminal activity involving five or more people (*id.* at 41:21-43:7).  Chief Judge Wolfson calculated an advisory sentencing range of 188 to 235 months' imprisonment (criminal history category of III and a total offense level of 34). (*Id.* at 44:2-11.)  Petitioner was sentenced to 204 months' imprisonment and a five-year term of supervised release.  (Crim. No. 19-134-3, ECF Nos. 541, 542.)  No notice of appeal was filed.

Petitioner testified at the evidentiary hearing that he had one conversation with his plea

11

counsel concerning possibly filing a notice of appeal following his sentencing. (ECF No. 26 at 6:17-19.) According to Petitioner, his attorney told him he was going to get six more years on his sentence if he appealed. (*Id.* at 6:20-24.) Petitioner said that this was the only issue plea counsel raised regarding the filing of a notice of appeal and counsel did not explain to him that filing a notice of appeal did not necessarily mean he had to perfect the appeal and that he had the right to withdraw the appeal. (*Id.* at 7:3-22 (stating that he did not remember whether counsel explained the process of filing a notice of appeal)).) Petitioner testified that he "specifically directed [plea counsel] not to file a notice of appeal." (*Id.* at 8:9-13.)

On cross-examination, Petitioner testified that he did not recall having a telephone conversation with plea counsel six days after the sentencing, receiving a letter from counsel regarding the filing of a notice of appeal, counsel mentioning the term "cross-appeal", or having discussions with counsel about filing a notice of appeal to challenge the two-level sentencing enhancement based on his possession of a machete in his residence at the time of the search of his residence (which uncovered illegal narcotics). (*Id.* at 10:17-21, 11:16-21,12:17-15:21.) Petitioner further stated that, although he had talked to his attorney about the volume of heroin and fentanyl the Court found he possessed, and plea counsel was concerned that he could be given "more time" if he appealed, counsel did not explain that the reason an appeal could result in a longer sentence was because "[he] could be found to be in possession of more narcotics." (*Id.* at 13:5-15.) Petitioner acknowledged that he spoke with plea counsel about the fact that, because he had a prior felony conviction under 21 U.S.C. § 851, "the best case scenario," even if he appealed, would be a sentence of fifteen years' imprisonment. (*Id.* at 11:3-15.) Petitioner also admitted that he explicitly told counsel not to file a notice of appeal because of the advice counsel gave him. (*Id.* at 13:25-14:9.)

According to plea counsel, the "guidelines at sentencing were litigated in this case," including "the volume of narcotics," and Petitioner and counsel also discussed the machete and supervisor/manager enhancements. (*Id.* at 18:4-18.) Plea counsel testified at the evidentiary hearing that he called Petitioner on September 22, 2020 (six days after sentencing) to discuss filing a notice of appeal. (*Id.* at 20:10-19.) Counsel told his client that "everything sort of went against us at sentencing except for the [Assistant United States Attorney] was arguing for a higher level of fentanyl and heroin and I was asking for the lower one between the two and the Judge granted the lower one," and "I thought we were very lucky to get that lower range." (*Id.* at 20:23-21:4.) Plea counsel told Petitioner that there was a "small chance" of prevailing on the machete issue on appeal and "get the 2-levels down," but, if Petitioner appealed, the Government could file a cross-appeal on the drug quantity issue (especially since the Assistant United States Attorney seemed to be "very adamant" on the drug quantity issue), which, if successful, would result in resentencing at "the higher level." (*Id.* at 21:4-22.) "[Plea counsel] said, it's your choice, you know, what do you want to do here? And he said, I'd rather not file the appeal." (*Id.* at 21:22-24.)

The plea counsel's notes were introduced into evidence, showing that the conversation regarding filing a notice of appeal lasted approximately twenty-four minutes. (*Id.* at 24:24-25:2.) The notes referred to the issues that were discussed in the conversation, including the danger of a cross-appeal, the possible sentencing ranges, and the two sentencing issues that the defense had lost (the machete enhancement and the contested "supervisor/organizer" enhancement). (*Id.* at 23:11-24:6.)

According to the notes, "Defendant does not want to appeal due to danger of losing weight issue in a cross-appeal and getting more time." (*Id.* at 24:21-22.) Petitioner's plea counsel sent him a letter on September 22, 2020 enclosing a copy of the certified criminal judgment and the

13

statement of reasons for the sentence and stating the following:

> After we conferred today, you decided not to appeal the judgment due to the risk of getting more imprisonment time if the government cross-appealed and won on the issue of accompli[ce] attribution, the weight of the heroin/fentanyl mixture that you would be responsible for within the conspiracy. I agreed with your decision due to the close call on the weight issue as well as the unlikely chance that you would prevail on either the machete or supervisor issues on appeal.

(*Id.* at 26:18-27:3.)  The final paragraph of the letter stated that, if Petitioner were to change his mind, he must inform counsel by September 29, 2020 that he wished to file a notice of appeal.  (*Id.* at 27:6-10 (citing applicable Federal Rule of Appellate Procedure).)  According to plea counsel, Petitioner never contacted him to file a notice of appeal within the applicable time period.  (*Id,* at 27:12-14.)

On cross-examination, counsel testified regarding "the long fight between the defense and the government regarding the weight of the fentanyl and heroin" (which predated Petitioner's guilty plea and involved, *inter alia*, the retention of a defense expert and issues with access to the seized narcotics for testing).  (*Id.* at 27:24-30:4.)  The attorney stated that, in his experience, the Government had cross-appealed "several times," although "it's not frequent."  (*Id.* at 30:6-15.)  He confirmed that Petitioner received "a below guidelines sentence," which the Government did not appeal.  (*Id.* at 30:16-22.)  Counsel also indicated that the machete issue would have been "a fair issue to raise on appeal" (*i.e.*, "it was something that wasn't, you know, ridiculous").  (*Id.* at 31:4-7.)

### B.       Petitioner's Amended Motion to Vacate

On September 27, 2021, Petitioner, through counsel, filed his original motion to vacate under § 2255. (ECF No. 1.)  The motion included two grounds for relief: (1) Ineffective Assistance of Counsel; and (2) False Testimony of Law Enforcement Officer.  (*Id.* at 4-5.)  But the motion

provided no facts supporting either ground for relief.  (*Id.*)  Instead, the motion merely stated that the supporting facts were "TO BE SET FORTH IN MEMORANDUM OF LAW TO BE FILED BY COUNSEL."  (*Id.)*

On November 19, 2021, Chief Judge Wolfson entered an order to show cause as to why the motion to vacate should not be dismissed without prejudice under Rule 4 of the Rules Governing Section 2255 Cases ("Rule") for failing to meet the pleading requirements of Habeas Rule 2.  (ECF No. 2 at 2-3.)

On December 2, 2021, Petitioner's counsel filed the Amended Motion to Vacate and a supporting memorandum of law (Petitioner's Memorandum of Law).  (ECF Nos. 3, 3-1.)  In Ground One, Petitioner claims that plea counsel was ineffective for failing to file a notice of appeal on Petitioner's behalf and that he would otherwise have filed an appeal.  (ECF No. 3-1 at 8-15.)  In Ground Two, Petitioner alleges that the actions of law enforcement so tainted the process as to merit vacatur.  (*Id.* at 15-22.)  On October 26, 2022, Chief Judge Wolfson ordered the Government to file an answer (ECF No. 7 ("October 26, 2022 Order")), and the answer was filed on December 21, 2022 (ECF No. 9).  On January 17, 2023, this case was reassigned to the Undersigned.  (ECF No. 10.)  Petitioner filed a reply on February 1, 2023 (Reply).  (ECF No. 11.)

In a May 1, 2024 Order, the Court ordered that it "will hold an evidentiary hearing limited to Ground One of the Motion [to Vacate] regarding whether plea counsel failed to file a notice of appeal on Petitioner's behalf."  (ECF No. 14 at 5.)  The Court denied Petitioner's counsel's request that he be appointed CJA counsel in this case on July 3, 2024 (ECF No. 16), and his request for reconsideration of this Order denying CJA appointment was denied on August 13, 2024, *Antonio v. United States*, No. 21-17659, 2024 WL 3791356 (D.N.J. Aug. 13, 2024).

On November 22, 2024, the Court conducted an evidentiary hearing on Ground One.  (ECF

15

Nos. 24, 26.)  Petitioner and his former counsel testified at the hearing.  (*See* ECF No. 26 at 4-33.)

On April 4, 2025, the Court ordered that, within thirty (30) days, "Respondent is directed to furnish and file on the docket" a copy of the transcript of Petitioner's change of plea hearing and the sentencing materials submitted by Petitioner and Respondent.  (ECF No. 27 ("April 4, 2025 Memorandum and Order") at 2.)  Petitioner filed a letter concerning the April 4, 2025 Memorandum and Order on July 28, 2025.  (ECF No. 28 ("July 28, 2025 Letter").)

## II.    <u>LEGAL STANDARDS</u>

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence.[3]  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

---

[3]    Respondent argues that the Amended Motion to Vacate is time barred because Petitioner did not file the Amended Motion to Vacate and the supporting Memorandum of Law until approximately two months after the one-year limitations period had expired and the grounds for relief do not relate back to Petitioner's original motion.  (ECF No. 9 at 12-13; *see also* ECF No. 14 at 1 n.1.)  However, as the Court noted in its May 1, 2024 Order:

> [Petitioner's] § 2255 counsel provided the following explanation for not filing the Memorandum of Law with the original Motion:

> > It should be noted that any delay (while offered not as an excuse but as an explanation) in filing the within Memorandum of Law and Exhibits was due to the fact that counsel had planned on securing a visit with the Petitioner at his place of incarceration, but that was delayed due to COVID restrictions of the Bureau of Prisons, and the difficulties in securing telephone and mail contact with the Petitioner.

(ECF No. 14 at 1 n.1 (quoting ECF No. 13-1 at 9).)  "[T]he Government does not acknowledge or address" Petitioner's equitable tolling argument, and the Court also "provided leave for Petitioner to supplement his filing."  (*Id.*)  However, the Court need not (and does not) rule on the timeliness issue because it finds that the Amended Motion to Vacate must be denied on other grounds.

> attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)); *accord United States v. Folk*, 954 F.3d 597, 602 (3d Cir. 2020) (citations omitted); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

A § 2255 motion cannot be used as a substitute for a direct appeal, and accordingly "[a] habeas petitioner is typically barred from collaterally attacking his conviction or sentence using issues that could have been brought on appeal but were not." *Salgado v. United States*, No. 24-0322, 2024 WL 5244386, at *3 (D.N.J. Dec. 30, 2024) (citing *Muhammad v. United States*, No. 20-15606, 2022 WL 445623, at *3 (D.N.J. Feb. 14, 2022)), *certificate of appealability denied by* No. 25-2319, 2025 WL 4053153 (3d Cir. Oct. 8, 2025). "Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised [on collateral review] only if he 'can prove either that he is actually innocent of the crime for which he was convicted, or that there is a valid cause for the default, as well as prejudice resulting from the default.'" *Id.* (quoting *Hodge v. United States*, 554 F.3d 372, 379 (3d Cir. 2009)).

In both grounds for relief, Petitioner alleges ineffective assistance of counsel. The "cause and prejudice" standard does not apply to an ineffective assistance of counsel claim. *See United States v. DeRewal*, 10 F.3d 100, 101 (3d Cir. 1993). The standard applicable to ineffectiveness claims is well established:

17

[c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the

18

> prejudice prong first where it is dispositive of a petitioner's claims.
> *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Section 2255(b) requires courts to hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Under this standard, "a district court should hold an evidentiary hearing when the habeas petition 'allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record.'" *Antonio*, 2024 WL 3791356, at *1 (alteration in original) (quoting *United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015)). "In assessing whether a hearing is necessary, the court 'must accept the truth of the movant's factual allegations unless they are clearly frivolous' or contradicted by the record." *Id.* (quoting *Tolliver*, 800 F.3d at 141); *see also id.* ("A movant need not 'prove' anything to warrant a hearing." (quoting *United States v. Arlington*, 13 F.4th 331, 335 (3d Cir. 2021))). When evaluating a *Strickland* claim, which requires proof that counsel failed to perform competently and that the petitioner was prejudiced by counsel's error, courts must determine whether the nonfrivolous facts "conclusively fail to show ineffective assistance of counsel." *Arrington*, 13 F.4th at 334 (quoting *United States v. Dawson*, 857 F.2d 923, 927-28 (3d Cir. 1988)). "[B]ald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing." *Campbell v. Burris*, 515 F.3d 172, 184 (3d Cir. 2008) (quoting *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987)); *see also* Rule 2(b)(2) (stating that the motion must "state the facts supporting each ground"); *Johnson v. United States*, 294 F. App'x 709, 210 (3d Cir. 2008) ("[V]ague and conclusory allegations contained in a § 2255 motion may be disposed of without further investigation by the District Court." (alteration in original) (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000))).

Under Rule 6(a), a party in a § 2255 matter must obtain leave of court to conduct discovery, which will only be granted following a showing of good cause. Good cause is shown where the request for discovery presents "reason to believe that [the petitioner] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief" if permitted to engage in discovery. *In re Platts*, 573 F. App'x 87, 87-88 (3d Cir. 2014) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)).

## III.   DISCUSSION

### A.   Ground One: Petitioner's *Flores-Ortega* Claim

When a petitioner alleges that counsel was deficient for failing to file an appeal, "a more specific version of the *Strickland* standard" established by the Supreme Court in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), applies. *Harrington v. Gillis*, 456 F.3d 118, 125 (3d Cir. 2006).

In *Flores-Ortega*, the Supreme Court stated that it was well established that a lawyer who disregards specific instructions from his or her client to file a notice of appeal acts in a professionally unreasonable fashion. *Flores-Ortega*, 528 U.S. at 477. "This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." *Id.* "At the other end of the spectrum, a defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently." *Id.* (citing *Jones v. Barnes,* 463 U.S. 745, 751 (1983)). The Court in *Flores-Ortega* then considered whether counsel is deficient for not filing a notice of appeal when the defendant has not clearly conveyed his or her wishes. *Id.*

According to *Flores-Ortega*:

In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. We employ the term "consult" to convey a specific meaning-advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance. That question lies at the heart of this case: Under what circumstances does counsel have an obligation to consult with the defendant about an appeal?

. . . .

We instead hold that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id.* at 479-81 (citations omitted).

21

To establish prejudice where the alleged deficient performance arises from a failure to file a notice of appeal, a defendant need only show "a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. "[E]vidence that there were nonfrivolous grounds for appeal or that the defendant . . . expressed a desire to appeal" is often "highly relevant" to showing that counsel performed deficiently, and that the defendant was prejudiced; however, a defendant is not required to show that his appeal would have had merit. *Id.*

"Petitioner's memorandum of law suggests that he and his plea counsel consulted about an appeal and that the Petitioner's plea counsel elected not to file an appeal." *Antonio*, 2024 WL 3791356, at *1 (footnote omitted). "Petitioner's counseled brief stated the following: While the Petitioner had initially requested that his assigned counsel file a Notice of Appeal to the Third Circuit, his attorney, after 'consulting' with him, did not do so." *Id.* (quoting ECF No. 3-1 at 7); (*see also* ECF No. 14 at 2 n.2 ("Based on the submissions of the parties, the Court is unable to determine whether Petitioner directed his defense counsel to file an appeal and counsel failed to do so, or if Petitioner initially directed counsel to file an appeal but changed his mind and withdrew that request based on counsel's advice, or if something else transpired." (citing ECF No. 3-1 at 8, 11, 13)). The Court accordingly ordered an evidentiary hearing to decide: "1) whether Petitioner directed plea counsel to file an appeal (and plea counsel failed to do so) and 2) whether plea counsel consulted with Petitioner about filing an appeal." *Antonio*, 2024 WL 3791356, at *1.

As to the first question, neither Petitioner nor his counsel indicated at the evidentiary hearing that Petitioner expressed any interest in filing an appeal prior to the expiration of the fourteen-day period to file a notice of appeal. On the contrary, both Petitioner and plea counsel testified that, following their conversation about filing a notice of appeal, Petitioner specifically

22

directed his attorney not to file a notice of appeal.  (ECF No. 26 at 8:9-13, 13:25-14:11, 21:22-24.)  The plea counsel's correspondence and notes confirm that Petitioner instructed counsel not to appeal.  (*See id.* at 24:20-25:26, 26:18-27:11.)  "[A] defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently."  *Flores-Ortega*, 528 U.S. at 477 (citing *Jones,* 463 U.S. at 751); *see also id.* at 478 ("If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." (citations omitted)).  In addition, Petitioner pled guilty, suggesting "that the defendant seeks an end to judicial proceedings."  *Id.* at 480.  Accordingly, the Court agrees with Respondent that "[Petitioner] told [his plea counsel] not to file [a notice of appeal]" and "[Petitioner] didn't tell [counsel] to file [a notice of appeal]."  (ECF No. 26 at 36:6-7.)

Regarding the second question, Petitioner argues that counsel's advice that if he appealed his conviction and was successful he would likely get more time in prison upon the fentanyl charges was "based only upon supposition and assumption" and "served to deny [Petitioner] an essential right."  (ECF No. 3-1 at 11.)  Claiming that he expressed serious reservations and concerns regarding the legal advice that his attorney was providing him in the May 13, 2019 Letter, Petitioner asserts that he did not knowingly, intelligently, and voluntarily decide to refrain from filing a notice of appeal.  (*Id.*)

According to Petitioner, the suppression motions filed by Wimbush, West, and Williams "raised significant issues regarding the behavior of one of the investigating law enforcement officers (Detective Sergeant Ordille of the Trenton Police Department), and specific and verifiable allegations that he deliberately and knowingly lied when seeking a search warrant in the case at

23

Bar." (*Id.* at 12.)  At the time he was being advised by counsel to agree to the terms of the Plea Agreement, which "included the appeal waiver," the motions to suppress had not yet been decided. (*Id.* at 13.)  Petitioner emphasizes Chief Judge Wolfson's findings in her 2020 decision that "Detective Sergeant's Ordille's own testimony, which clearly establishes that he deliberately obfuscated the purpose of the surveillance" and that, "[e]ven if well-intentioned," Detective Sergeant Ordille deliberately misstated the information in the search warrant affidavit." (*Id.* at 13 n.2 (alteration added) (emphasis omitted) (quoting *Wimbush*, 2020 WL 1873020, at *20).) Furthermore, Petitioner notes the findings in *Wimbush* that "[b]oth of the statements regarding the interaction with the confidential informant and the misrepresentation of law enforcement's purpose are affirmative acts of deliberate deception," and "[t]he failure to apprise a reviewing judge of all the material facts relevant to the law enforcement investigation, particularly in the context of hearsay information obtained from confidential informants, and attesting to the reliability of informants, is unjustifiable." (*Id.* (alterations added) (emphasis omitted) (quoting *Wimbush*, 2020 WL 1873020, at *20)).)

Based on the testimony presented at the evidentiary hearing, Petitioner's counsel did not mention the issues raised by the motions to suppress in his post-sentencing consultation with Petitioner regarding the "advantages and disadvantages of taking an appeal," *Flores-Ortega*, 528 U.S. at 478.  Nonetheless, Petitioner's arguments regarding Detective Sergeant Ordille's misrepresentations did not constitute "nonfrivolous grounds" for an appeal, *id.* at 486 (stating that both the performance and the prejudice prongs may be satisfied "if the defendant shows nonfrivolous grounds for appeal" (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).  In fact, Petitioner acknowledges that Chief Judge Wolfson denied the motions to suppress on April 15, 2020. (ECF No. 3-1 at 14.)  Petitioner indicates that the ruling provided a valid basis for Petitioner

24

to appeal (or at least a basis for filing a notice of appeal to preserve the issues).  (*Id.* at 13-14.)

However, Petitioner did not join in the motions to suppress filed by Wimbush, West, and Johnson,

or otherwise move to suppress the evidence obtained as a result of the search of Wimbush's motor

vehicle on September 6, 2018.[4]  In any event, Petitioner lacked standing to challenge the search

because "[Petitioner] did not own and was not even present in [Wimbush's] automobile when it

was stopped [and searched]."  *United States v. Matthews*, 597 F. Supp. 3d 694, 699-700 & n.5

(D.N.J. 2022) ("Mr. Matthews lacks standing to challenge the search of Swaby's car.  It is

axiomatic that Fourth Amendment rights are personal.  A person may obtain suppression based on

violation of that person's own privacy rights, not the privacy rights of another.").

Furthermore, Petitioner baldly asserts that suppression of "the seized narcotics would have

been fatal, or at least near to [sic], to the Government's case."  (ECF No. 3-1 at 13.)  Petitioner

notes that the Third Superseding Indictment alleged in Count One that, as part of the conspiracy,

on or about September 6, 2018, Wimbush, Williams, and West possessed in a secret trap

compartment in a vehicle registered to Wimbush approximately 57 bricks of heroin, several

firearms, and rounds of ammunition.  (*Id.;* ECF No. 3-2 at 7-8.)  As Respondents point out (ECF

No. 9 at 19-20), Petitioner was not charged with any firearms-related offenses, and the Third

Superseding Indictment alleged, *inter alia*, that, on or about October 25, 2018, Petitioner possessed

in his residence approximately 1.5 kilograms of heroin, "a significant amount of which also

contained fentanyl."  (*Id.* at 9.)  In his Plea Agreement, Petitioner stipulated to the fact that "[t]he

quantity of heroin involved in the conspiracy charged in the Third Superseding Indictment, for

---

[4]    In his testimony at the evidentiary hearing, Petitioner stated in passing that he raised "the misconduct of the police officer" with Chief Judge Wolfson "regarding [plea counsel's] representation."  (ECF No. 26 at 5:22-24.)  However, Petitioner's May 13, 2019 Letter requesting the assignment of a different attorney did not mention alleged police misconduct.  (ECF No. 3-5 at 1-2.)

which [Petitioner] is responsible, is at least one kilogram." (ECF No. 3-3 at 7.) The PSR, in turn, stated that, on October 25, 2018, following Petitioner's arrest at his residence, law enforcement conducted a court-authorized search of his residence and seized "a total of approximately 800 bricks of heroin, along with a substantial amount of unpackaged heroin." (PSR ¶ 155.) The PSR further cited to lab reports "regarding drug evidence at Antonio's residence on October 25, 2018," indicating that "more than 1.4 kilograms of heroin and fentanyl was found." (PSR ¶ 183.) Finally, Chief Judge Wolfson sustained the defense's objection to the two-level enhancement "based upon the 1.2 kilograms of fentanyl being present." (Crim. No. 19-134-3, ECF No. 725 at 33:17-22.)

Under the circumstances, the suppression of the evidence found in Wimbush's vehicle would not have affected the case against Petitioner. Petitioner also acknowledges that "any appeal runs with it the risk of a vacatur and returning the accused to his or her indictment, pre-trial stage (sic], and the concomitant risk of a greater sentence on re-trial and conviction." (ECF No. 3-1 at 14 (citations omitted).) Such an outcome would have resulted in Petitioner losing the benefits he obtained from his Plea Agreement.

In any event, the evidentiary hearing testimony establishes that Petitioner's counsel consulted with his client about filing an appeal and reasonably advised Petitioner as to the advantages and disadvantages with filing a notice of appeal. As to the "disadvantages," Petitioner testified that counsel "said [Petitioner] was going to get six more years" if he filed a notice of appeal and that "the best case scenario, even if [he] appealed, would be the 15 years imprisonment [given the statutory minimum]." (ECF No. 26 at 8:20-24, 11:3-15.) Petitioner claims he had never heard the term "cross-appeal," that counsel did not advise him about filing an appeal to challenge the two-level enhancement for possessing a machete, explain why he could receive a longer sentence if he appealed (i.e., he could be found to be in possession of a greater quantity of

26

narcotics), or address "some of the pluses about filing a notice of appeal," and Petitioner did not recall receiving a letter from plea counsel regarding their consultation on filing of a notice of appeal. (*Id.* at 11:16-21, 12:10-16, 13:9-15, 14:12-14.) The Court nevertheless credits plea counsel's detailed testimony, corroborated by counsel's notes and a copy of the letter (and a mailing receipt) sent to Petitioner following their consultation, that, *inter alia*, he told his client that they were "very lucky" to get a finding of a lower drug quantity, resulting in the lower sentencing range (*id.* at 20:23-21:4.); he advised Petitioner that there was a "small chance" of prevailing on the machete issue on appeal and "get the 2-levels down," but, if Petitioner appealed, the Government could file a cross-appeal on drug quantity issue which, if successful, would result in resentencing at "the higher level" (*Id.* at 21:4-22); they also discussed the possibility of appealing the "supervisor/organizer enhancement" (*Id.* at 23:11-24:6, 26:18-27.1.); and "[Counsel] said, it's your choice, you know, what do you want to do here? And he said, I'd rather not file the appeal" (*Id.* at 21:22-24; *see also id.* at 27:6-10 (counsel's letter stated that, if Petitioner were to change his mind, he must inform counsel by September 29, 2020 that he wished to file a notice of appeal), 27:12-14 (counsel testified that Petitioner never asked him to file a notice of appeal within the applicable time period)).

The Court also concludes that Petitioner has failed to satisfy the prejudice prong of *Flores-Ortega*. As noted above, the suppression issues did not constitute "nonfrivolous" grounds for an appeal, and Petitioner has not presented "other substantial reasons that he would have appealed." *Flores-Ortega*, 528 U.S. at 486 (citing *Rodriquez v. United States*, 395 U.S. 327, 380 (1969)). In fact, Petitioner pled guilty, and he did not testify at the evidentiary hearing that he expressed an interest in filing an appeal prior to the expiration of the applicable fourteen-day period for filing notice of appeal. *See id.* ("To prove deficient performance, a defendant can rely on evidence that

27

he sufficiently demonstrated to counsel his interest in an appeal.  But such evidence alone is insufficient to establish that, had the defendant received reasonable advice from counsel about the appeal, he would have instructed his counsel to file an appeal.").

Petitioner argues that plea counsel should have filed a notice of appeal because it constitutes a ministerial act taking no more than "two" or "three minutes;" filing a notice of appeal would not have required Petitioner to "perfect" the appeal but would have provided the time needed for counsel and Petitioner to evaluate whether they wanted to pursue an appeal; and it was too burdensome to expect an unsophisticated criminal defendant to decide in only fourteen days whether he wanted to appeal based on counsel's speculation regarding a hypothetical cross-appeal resulting in a longer sentence.  (ECF No. 26 at 33:5-35:18.)  However, Petitioner acknowledges that this "Court is bound by Supreme Court, Third Circuit precedent here."  (*Id.* at 34:8-10.)  Applying this applicable precedent, the Court concludes that plea counsel "consulted with the defendant about an appeal," Petitioner "explicitly [told] his attorney *not* to file an appeal," and, assuming *arguendo* that counsel's performance was constitutionally deficient, Petitioner had not "demonstrate[d] that, but for counsel's deficient conduct, he would have appealed," *Flores-Ortega*, 528 U.S. at 477-78, 486 (citations omitted).  To the extent that Petitioner asks this Court to discard or depart from Supreme Court precedent, it is uncontested that the Court is bound by this precedent.

Because Petitioner has failed to satisfy either the performance or the prejudice prong under *Flores-Mejia*, the Court denies Ground One.

### B.    Ground Two: False Testimony of Law Enforcement Officer

In Ground Two of his Amended Motion to Vacate, Petitioner claims that "the actions of law enforcement so tainted the process as to merit a vacatur." (ECF No. 3-1 at 15 (emphasis

omitted).)  Petitioner requests relief on the grounds that the allegedly "perjurious" statements of Detective Sergeant Ordille in his affidavit of probable cause for the September 6, 2018 search warrant for Winbush's vehicle and his testimony at the suppression hearing before Chief Judge Wolfson "directly impacted and polluted" the prosecution against Petitioner.  (*Id.* at 22.)  For the reasons stated below, the Court agrees with Respondent that this ground for relief is procedurally defaulted and without merit.  (*See* ECF No. 9 at 20-23.)

According to Petitioner, "[t]he issue here revolves around the actions of one particular law enforcement officer who was key to the entire investigation and ultimate prosecution."  (*Id.*)  Specifically, the narcotics and other contraband seized from the Passat allegedly served as an element of Count One, to which Petitioner pled guilty, and Petitioner quotes an allegation in the Third Superseding Indictment alleging that, as part of the conspiracy, Wimbush, Williams, and West possessed 57 stamped bricks of heroin, several firearms, and ammunition in a secret trap compartment of the vehicle.  (*Id.* at 18.)  Wimbush, West, and Williams moved to suppress this evidence "that [purportedly] served as the basis for the Petitioner's charges and subsequent plea," and, according to Petitioner, Chief Judge Wolfson "recognized that not only was there false police testimony at the suppression hearing, but that the underlying affidavit, submitted in support of the warrant that uncovered the evidence, also contained false and misleading statements" regarding the purpose of the surveillance.  (*Id.* at 18-19.)  Petitioner states that, while finding that Detective Sergeant Ordille's actions were deliberate and unjustified, Chief Judge Wolfson made a "conclusory finding" upholding the search under "the penumbra of a valid automobile search."  (*Id.* at 20 & n.5 (citations omitted).)   Subsequently, the Trenton Police Department filed disciplinary charges against Detective Sergeant Ordille, and a hearing officer found that the

detective submitted false and misleading statements in his sworn search warrant affidavit and prohibited his testimony as a witness without independent corroboration.  (*Id.* at 20-21.)

Petitioner contends that any testimony from Detective Sergeant Ordille would be viewed as incredible by a factfinder, the detective was "clearly a key piece of the Government's case as against Mr. Antonio" and "its [sic] presence, at the time [Petitioner] executed the Plea Agreement was clearly a key factor in his decision-making process."  (*Id.* at 21.)  Noting that Detective Sergeant Ordille withdrew his challenge to the hearing officer's findings on March 24, 2021 (after Petitioner's guilty plea and sentence), Petitioner asserts that "[t]his newly discovered evidence not only directly and irrefutably impacted [Petitioner's] decision to plead guilty, but also impacted any trial that he may have opted to proceed with."  (*Id.*)  According to Petitioner, it is clear from Chief Judge Wolfson's suppression ruling that the prosecution was aware that the detective lied on the witness stand and had provided false sworn statements in support of the search warrant, and such false statements directly impacted and tainted the subsequent proceedings.  (*Id.* at 22.)

In his Reply, Petitioner claims that he "argued, in his habeas petition, that, notwithstanding the false testimony of the affiant, the trial court erred in ruling that the items seized would be deemed admissible as part of an otherwise permissible automobile search."  (ECF No. 11 at 7.) Petitioner indicates that this issue implicates his Fourth Amendment rights and that a party may obtain relief under § 2255 based on perjurious testimony.  (*Id.*)

"A convicted defendant may attack his sentence under § 2255 by alleging that a Government witness committed perjury."  *United States v. Jones*, 832 F. Supp. 2d 519, 534 (E.D. Pa. 2011) (citing *United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir. 1992)).  It is well established that, "[i]f a prosecutor uses testimony it knows or should know is perjury, it is fundamentally unfair to an accused." *Id.* (alteration in original) (quoting *Biberfeld*, 957 F.2d at 102).  To establish a due

30

process violation, Petitioner must show that "(1) [the witness] committed perjury; (2) the Government knew or should have known of [the witness's] perjury; (3) [the witness's] testimony went uncorrected; and (4) there is a reasonable likelihood that the false testimony could have affected the verdict." *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (citing *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004)), *superseded by regulation on other grounds as stated in Rad v. Att'y Gen. United States*, 983 F.3d 651, 668 n.13 (3d Cir. 2020). "A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

However, Petitioner did not file a direct appeal from the underlying criminal judgment. A § 2255 motion cannot be used as a substitute for a direct appeal, and "[a] habeas petitioner is typically barred from collaterally attacking his conviction or sentence using issues that could have been brought on appeal but were not." *Salgado*, 2024 WL 5244386, at *3 (citation omitted); *see also Biberfeld*, 957 F.2d at 104 ("Because [Petitioner] never raised the perjury issue at trial or on direct appeal, he must show cause and actual prejudice, or else his waiver will not be excused." (citing *McCleskey v. Zant*, 466 U.S. 467, 493-95 (1991), *superseded by statute on other grounds as stated in Banister v. Davis*, 590 U.S. 504 (2020))). Accordingly, Petitioner's Fourth and Fifth Amendment claims are barred unless Petitioner establishes cause and prejudice or actual innocence.

Additionally, Petitioner pled guilty pursuant to a plea agreement. "[A] defendant who enters a counseled, intelligent, and voluntary plea agreement 'may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.'" *DCosta v. United States*, No. 20-15029, 2024 WL 4356135, at *9 (D.N.J. Oct. 1,

31

2024) (quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)). "By pleading guilty, Petitioner not only waived his right to raise any affirmative defenses at trial, he also waived any potential ineffective assistance of counsel claims relating to counsel's failure to discover [or present] those defenses prior to the guilty plea." *Id.* (alteration in original) (quoting *Spruell v. United States*, No. 15-6992, 2021 WL 1712233, at *2 (D.N.J. Apr. 30, 2021)).

Petitioner indicates that the procedural default is excused because plea counsel provided ineffective assistance of counsel by failing to raise this issue of perjury at his sentencing.[5] (ECF No. 11 at 8.) Petitioner also appears to argue that the perjured statements resulted in an invalid guilty plea. (*See* ECF No. 3-1 at 21-22.) Generally, a guilty plea is valid if it represents a voluntary and intelligent choice among alternative courses of action. *See Kelly v. United States*, No. 21-19855, 2024 WL 5216288, at *4 (D.N.J. Dec. 23, 2024). "Where a defendant is represented by counsel and enters a guilty plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in

---

[5]    Petitioner also indicates that he had cause for the default based on "newly discovered evidence." (ECF No. 3-1 at 21)*; see also Biberfeld*, 957 F.2d at 104 ("We hold that if a § 2255 movant can show that the factual basis for a perjury claim was not reasonably available to him or his counsel at trial, he has made a sufficient showing of cause to raise the perjury issue for the first time on collateral attack." (citing *McCleskey*, 499 U.S. at 493-95)). However, Petitioner notes that "the Motions to Suppress [based *inter alia* on the alleged deliberate misstatements in Detective Sergeant Ordille's affidavit] were filed almost a year before the execution of the Plea Agreement (*id.* at 11-12 (citation omitted)) and "the *Wimbush* decision came down several months prior to the actual sentencing" (ECF No. 11 at 8). Petitioner cites to the city's hearing officer's decision on the disciplinary charges filed by the Trenton Police Department, which found it was proven that Detective Sergeant Ordille submitted false and misleading statements in the affidavit and ruled that he cannot testify as a witness without independent corroboration, and the fact that it was not until March 24, 2021 that the detective withdrew his final challenge to the hearing officer's findings (after Petitioner had both pled guilty and been sentenced). (ECF No. 3-1 at 21.) However, Petitioner fails to show that such circumstances, arising out of a civil service disciplinary proceeding, provide the factual basis for a perjury claim that was not reasonably available to him or his counsel.

Petitioner does not claim actual innocence.

criminal cases.'"  *Id.* (quoting *Hill*, 474 U.S. at 56).  Furthermore, "[i]neffective assistance of counsel can satisfy the 'cause' element of the procedural default inquiry, *see United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000), but claims of ineffectiveness must rise to the level of constitutional deprivation under the test announced in *Strickland v. Washington*, 466 U.S. 668 (1984)."  *Salgado*, 2024 WL 5244386, at *3.  The "cause and prejudice" requirement does not apply to an ineffectiveness claim.  *See DeRewal*, 10 F.3d at 101.

For substantially the same reasons that the Court rejected Petitioner's similar arguments in support of Ground One of his Amended Motion to Vacate in Section III.A., *supra*, the Court concludes that the Fourth and Fifth Amendment claims raised in Ground Two of the Amended Motion to Vacate are without merit.  An attorney "does not act deficiently or create prejudice by failing to raise or prevail on a meritless argument."  *Minaya v. United States*, No. 21-18050, 2023 WL 3338626, at *3 (D.N.J. May 10, 2023) (citing *United States v. Sanchez*, 53 F. App'x 208, 210 (3d Cir. 2002)), *certificate of appealability denied*, No. 23-2393, 2023 WL 11892827 (3d Cir. Nov. 8, 2023); *see also McBride v. Kuhn*, No. 22-2016, 2025 WL 1119479, at *5 (D.N.J. Apr. 14, 2025) (stating that counsel cannot be ineffective for declining to raise a meritless issue), *appeal filed by sub nom. McBride v. Comm'r, N.J. Dep't of Corr.*, No. 25-1934 (3d Cir. May 14, 2025).

First, Petitioner lacked standing to challenge the search because "[Petitioner] did not own and was not even present in [Wimbush's] automobile when it was stopped [and searched]."  *Matthews*, 597 F. Supp. 3d at 699-700 & n.5.

In addition, as Petitioner notes (*see* ECF No. 3-1 at 20), Chief Judge Wolfson denied the motions to suppress filed by Wimbush, Williams, and West (three Defendants with standing to challenge the search warrant) on the grounds that "the validity of the search warrant is immaterial because, pursuant to the automobile exception, law enforcement could search the entirety of the

33

vehicle, without a warrant, regardless of whether they had the opportunity to seek a warrant."

*Wimbush*, 2020 WL 1873020, at *18 (citations omitted).  Accordingly, the Court "need not make

a finding regarding the validity of the search warrant because law enforcement was not required

to seek a warrant."  *Id.* (citations omitted).  The Court further observed in a footnote that, "even

assuming the *Franks* analysis was applied, Defendants' motion would fail at the second phase of

the *Franks* analysis [whether the false statements are material or necessary to the probable cause

determination]" because:

> After supplementing the search affidavit with the improperly
> omitted facts and eliminating the misstatements, as required by the
> *Franks* framework, I, nonetheless, find that the misstatements and
> omissions, while significant, were not material or necessary to the
> probable cause determination, due to the simple fact that the search
> warrant affidavit correctly states that the canine officer indicated the
> presence of drugs in the Volkswagen Passat. That alone would be
> sufficient for the judge authorizing the warrant to find probable
> cause. *Pierce*, 622 F.3d at 213 ("[A] dog's positive alert while
> sniffing the exterior of the car provides an officer with the probable
> cause necessary to search the car without a warrant.").

*Wimbush*, 2020 WL 1873020, at *18 n.25.  While Petitioner asserts that Chief Judge Wolfson erred

in ruling that the items seized would be deemed admissible as part of an otherwise permissible

automobile search (ECF No. 11 at 7), he does not provide any legal grounds in favor of this

assertion other than baldly characterizing the Fourth Amendment findings as "conclusory" (ECF

No. 3-1 at 20 n.5).

In addition, Detective Sergeant Ordille did not testify against Petitioner, and there is no

indication that the specific misrepresentations in the search warrant affidavit regarding police

interactions with an informant and the purpose of the surveillance were used against him at any

stage of the criminal proceeding or would have been used against him if he had opted to proceed

to trial.  While Petitioner indicates that Detective Sergeant Odille perjured himself at the

34

suppression hearing, he does not identify any false statements (and Chief Judge Wolfson did not find that any law enforcement personnel committed perjury at the suppression hearing). Furthermore, the suppression of the evidence found in Wimbush's vehicle would not have affected the case against Petitioner.  For instance, approximately 800 "bricks" of heroin, along with a "substantial" amount of unpackaged heroin was found at Petitioner's residence.  (PSR ¶ 155.)

For the foregoing reasons, Petitioner has failed to show that his plea counsel acted deficiently or created prejudice by failing to raise Fourth and Fifth Amendment claims based on the detective's alleged perjury.  The Fourth and Fifth Amendment claims in Ground Two are procedurally defaulted, Petitioner has failed to excuse the default, and, in any event, the claims fail on their merits.  Furthermore, to the extent that Ground Two raises a freestanding ineffectiveness claim, it likewise fails on its merits.  Accordingly, the Court denies relief on Ground Two.[6]

## C.     Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason

---

[6]     In his Reply, Petitioner requests an evidentiary hearing "as to whether relief is necessitated based upon a claim of perjury, and the participation of the Government in securing and relying upon perjurious testimony, the best manner to resolve this is through an evidentiary hearing," particularly because Chief Judge Wolfson relied upon her own evaluation of the testifying officers' credibility.  (ECF No. 11 at 8.)  However, for the reasons stated in Section III.A., the Court concludes that an evidentiary hearing on Ground Two is unwarranted because "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief" under 8 U.S.C. § 2255(b).

Additionally, Petitioner asks the Court to order Respondent to produce the documents the Court had directed Respondent to produce in its April 3, 2026 Memorandum and Order within ten days or otherwise an appropriate sanction would be imposed and that the Court will draw an adverse inference against the Respondent's position.  (ECF No. 28 at 2.)  The Court denies Petitioner's request because the record conclusively shows that Petitioner's claims for relief lack merit.

could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue" where "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As Petitioner's Amended Motion to Vacate must be denied for the reasons stated above, Petitioner is denied a certificate of appealability in this case.

## IV.    CONCLUSION

For the reasons set forth above, the Amended Motion to Vacate is **DENIED**, and a certificate of appealability shall not issue.

An appropriate Order will be entered.

_____
**GEORGETTE CASTNER**
**United States District Judge**

Dated: May 14, 2026

36